UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| NICOLE MCGAUGH,<br><br>          Plaintiff,<br><br> v.<br><br> HOLT PUBLIC SCHOOLS; HOLT PUBLIC SCHOOLS BOARD OF EDUCATION; and JESSICA COTTER, in her official and individual capacities;<br><br>          Defendants. | Case No.: 1:24-cv-368<br><br>Hon. |

Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
Attorneys for Plaintiff
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

## **COMPLAINT AND JURY DEMAND**

Plaintiff NICOLE MCGAUGH, by and through her attorneys, ABDNOUR WEIKER LLP, hereby files the following complaint for disability discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*; Michigan's Persons with Disabilities Civil Rights Act, M.C.L. 37.1101, *et seq.*; and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. 37.2101, *et seq.*, against Defendants as captioned above.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1343 and 28 U.S.C. § 1331.

2. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in Holt, Michigan.

## PARTIES

4. Plaintiff Nicole McGaugh has been employed as a teacher in Holt Public Schools for 23 years, currently serving as a seventh-grade math teacher. At all times pertinent to this suit, she resided in Ingham County, Michigan.

5. Defendant Holt Public Schools ("HPS") was at all relevant times and continues to be a public educational institution in Ingham County, Michigan, organized and existing under the laws of the State of Michigan.

6. HPS Board of Education is the governing body of HPS.

7. Defendant HPS and Defendant Board of Education are hereinafter collectively referred to as "the HPS Defendants."

8. At all material times, Defendant Jessica Cotter, in her official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of HPS, acting or failing to act within the scope, course, and authority of her employment and employer. At all material times, Defendant Cotter was HPS's Executive Director of Curriculum and Staff Development.

## APPLICABLE LAW AND POLICY

9.  The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 *et seq*., states

that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

10.  Under the ADA, the term "covered entity" means an employer, employment agency, labor

organization, or joint labor-management committee.

11.  Under the ADA, 42 U.S.C. § 12111, the term "employer" is defined as:

> ...A person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

42 U.S.C. § 12111(5)(A).

12.  Under the ADA, the term "discriminate against a qualified individual on the basis of

disability" includes but is not limited to:

> (1) Limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; …

> (3) Utilizing standards, criteria, or methods of administration--
>     (A) that have the effect of discrimination on the basis of disability; or
>     (B) that perpetuate the discrimination of others who are subject to common administrative control.

42 U.S.C. § 12112(b).

13. Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701 *et seq*.,

   provides that:

> No otherwise qualified individual with a disability in the United States, as
> defined in Section 705(20) of this title, shall, solely by reason of her or his
> disability, be excluded from the participation in, be denied the benefits of,
> or be subjected to discrimination under any program or activity receiving
> Federal financial assistance…

   29 U.S.C. § 794(a).

14. Section 504 defines a "program or activity" to include all operations of a local educational

   agency.  29 U.S.C. § 794(b)(2)(B).

15. The Persons with Disability Civil Rights Act ("PDCRA") prohibits discrimination in

   Michigan based on disability in employment, educational institutions, and public

   accommodations, and housing, and requires accommodation of disabled individuals.

   M.C.L. 37.1102.

16. PDCRA prohibits retaliation against individuals who complain of discrimination under the

   Act. M.C.L. 37.1602(a).

17. The Elliott-Larsen Civil Rights Act ("ELCRA") prohibits discrimination in Michigan

   based on "religion, race, color, national origin, age, sex, height, weight, familial status, or

   marital status" in employment, educational institutions, public accommodations, and

   housing. M.C.L. 37.2102(1).

18. ELCRA prohibits retaliation against individuals who complain of discrimination under the

   Act. M.C.L. 37.2701(a).

## FACTUAL ALLEGATIONS

### *Disability Discrimination and Failure to Accommodate*

19. On or around November 9, 2021, Plaintiff was involved in a traumatic incident that occurred at her place of employment at Holt Junior High School ("HJHS"), in which a student reported to her that a 9mm hollow tip bullet found in the hallway outside her classroom.

20. After the bullet was found, upon information and belief, HPS did not follow its safety plan and took 52 minutes to call the police.

21. This incident and HPS's failure to respond in accordance with its safety plan immediately caused Plaintiff significant anxiety and she immediately noticed negative health consequences, including an elevated heart rate, speech affected by reversing words, sleep issues, nightmares, mind racing, inability to focus, emotional outbursts, avoidance of going to school and her son's school events, hypervigilance, and reckless behavior.

22. Plaintiff sent an email on the day of the incident to her principal and upper administration notifying them that she did not feel safe on the date of the incident. Petitioner did not get any response until after the school day was over.

23. Plaintiff struggled with coming back to work after the incident due to her increased anxiety. She went to work on November 11, 2021, and could only teach one hour before she had to go home due to anxiety.

24. Plaintiff's symptoms continued, and her medical provider prescribed her an additional medication for anxiety.

25. On or around November 15, 2021, Petitioner submitted a request for Family and Medical Leave Act ("FMLA") leave for a serious health condition, which HPS approved.

26. On November 30, 2021, a mass shooting occurred at Oxford High School in Oxford Township, Michigan.  Armed with a 9mm semi-automatic handgun, a 15-year-old student murdered four students and injured seven people, including a teacher.

27. The Oxford High School shooting caused Plaintiff's anxiety symptoms to worsen.

28. On or around December 14, 2021, Plaintiff's medical provider diagnosed her with post-traumatic stress disorder ("PTSD") because of the incident.

29. At some point after that date, Plaintiff notified HPS that she would need accommodations to return to work.

30. On or around January 3, 2022, while she was still on FMLA leave and during a school break, Plaintiff received a text message from Charles Richardson, Uniserv Director for the Michigan Education Association ("MEA"), Plaintiff's union.

31. In this text message, Richardson stated that he and Plaintiff needed to talk soon due to the accommodation request Plaintiff had submitted to HPS.

32. Plaintiff had not received any communication from Richardson since around November 16, 2021.  She had texted Richardson on November 18, 2021, and December 1, 2021, but did not receive a response to either of those text messages.

33. Plaintiff had at no time communicated with Richardson about her accommodations request or gave HPS permission to talk to Richardson about the matter.

34. HPS never explained to Plaintiff why it was communicating with Richardson rather than Plaintiff directly.

35. On or around January 13, 2022, Plaintiff submitted a reasonable accommodation request to HPS.

36. The reasonable accommodation request stated that Plaintiff was experiencing PTSD, a mental impairment that was restricting her from working and performing the essential functions of her job, and explained that Plaintiff, who experienced intense fear for her and her students' safety as a symptom of her PTSD, needed accommodations to ensure that this fear would not impede upon her ability to perform the essential function of her position.

37. Along with the reasonable accommodation request, Plaintiff submitted HPS's required Health Care Accommodation Assessment Questionnaire ("Accommodation Assessment") completed by her medical provider at Sparrow Medical Group in Lansing, Michigan.

38. The Accommodation Assessment listed the following, among others, essential functions of Plaintiff's position: "ability to compare, analyze, and communicate orally and in writing," "implement[ing] and maintain[ing] classroom management," and "instruct[ing] pupils in citizenship, school policies, basic subject matter…." It specified that Plaintiff experienced the following functional limitations because of her "mental impairment that substantially limits one of more of [her] major life activities...": inability to manage tasks, "maintain [her] classroom management," or "maintain [her] concentration." It specified that Plaintiff's functional limitations included an inability "to instruct on fulfilled school policies" or "instruct students on citizenship responsibilities." It explained that due to the functional limitations of Plaintiff's disability, she was "limited in describing safety, citizenship, [and] school policies as the measures to complete these theories have not been initiated" by HPS. It explained that Plaintiff "is not able to maintain classroom management[,] as management entails safety." Addressing Maslow's hierarchy of needs, it stated that "without [Plaintiff's] safety being met, confidence and achievement cannot be expected."

39. At the recommendation of her medical provider, Plaintiff also submitted a list of the following necessary accommodations for her disability to help prevent and relieve stress and anxiety produced by that disability: (1) an updated and revised HPS Emergency Operating Plan ("EOP") to ensure safety of District staff and students; (2) a door with a "solid core" for Plaintiff's classroom with a lock; (3) implementation of a HJHS-wide safety manual for staff members to ensure understanding and compliance with the new EOP; (4) implementation of a HJHS-wide safety manual for students to ensure understanding and compliance with the new EOP; (5) copies of email communications sent to parents and guardians of School students sent to HJHS staff members; (6) pre-arrangements made for any meeting with the HJHS principal, including the presence of at least one other individual; (7) a 24-hour response deadline to any email sent to HPS administration; and (8) weekly updates from HPS Human Resources department regarding the implementation of her requested accommodations.

40. On the same date that Plaintiff submitted the reasonable accommodation request and Accommodation Assessment, she submitted an Authorization to Release Medical Information to the HPS. The release specifically authorized HPS to discuss protected health information pertaining to her diagnosis, treatment, prognosis, functional limitations, and restrictions related to her Accommodation Request with her medical providers at Sparrow Medical Group.

41. Upon information and belief, on or around January 27, 2022, Shanna Janowiak, from HPS's human resources department, contacted  Sparrow Medical Group to request information about Petitioner's paperwork.

42. Sparrow Medical Group was unable to share information to Janowiak because Janowiak never sent Plaintiff's signed medical release to Sparrow Medical Group even though Janowiak had it in her possession.

43. Upon information and belief, Janowiak then accused Plaintiff of falsifying the paperwork and fraudulently completing paperwork herself, rather than having a medical provider at Sparrow Medical Group complete it.

44. Upon information and belief, Sparrow Medical Group staff told Janowiak that a Sparrow medical provider did fill out the paperwork.

45. Upon information and belief, Janowiak then told Sparrow Medical Group she thought that Plaintiff had added to the form afterward, which was false.

46. Janowiak also stated the accommodation requests constituted "policy changes" and if Plaintiff's condition was that severe, then she was unsafe to work in the classroom.

47. Sparrow Medical Group staff reported these communications to Plaintiff.

48. Plaintiff remained on paid medical leave through the end of the 2021-2022 school year, and her HPS email account was locked and therefore inaccessible to her starting on around February 8, 2022.

49. On or around March 4, 2022, Erin Quinlan, HPS Director of Human Resources, sent an email to Plaintiff to inform her that her HPS email account would be unlocked and provided a new password for the account.

50. Plaintiff responded with two emails that same day to inform Quinlan that the password Quinlan had provided was incorrect and that she could not unlock the HPS email account at that time.

51. Plaintiff asked that Quinlan and HPS communicate with her through her personal email address or by phone until the issue with her HPS email was resolved.

52. Neither Quinlan nor any other HPS employee responded, and Plaintiff remained unable to access her HPS email.

53. On or around June 27, 2022, Petitioner sent an email to Quinlan requesting an update on the status of her reasonable accommodation request.

54. On or around June 28, 2022, Quinlan responded that Janowiak had provided a response to the reasonable accommodation request in February 2022 to Plaintiff's HPS email address.

55. Plaintiff responded and reminded Quinlan of her March 4 email, stating that she did not have access to her HPS email account and that she had requested that HPS communicate with through her personal email or phone until the email issue was resolved.

56. Quinlan responded, refusing to use alternative methods to communicate with Plaintiff despite Plaintiff having no access to her HPS email account.

57. Plaintiff remained unable to access or view Janowiak's response to her reasonable accommodation request.

### *OCR Complaint*

58. On or around January 8, 2022, Plaintiff filed a complaint with the U.S. Department of Education, Office for Civil Rights ("OCR"), alleging discrimination by HPS against HPS students on the bases of race, color, and disability.[1]

59. On or around July 12, 2022, OCR opened an investigation into Plaintiff's complaint against HPS.[2]

60. The investigation notice identified three areas of investigation:

---

[1] *See* Exhibits 1 and 2.
[2] *See* Exhibit 3.

a. Whether the District, on the ground of race, color, or national origin, denied a student any service or benefit provided under its program; provided the student services or benefits that were different from or provided in a different manner from services or benefits provided to other students; restricted the student in the enjoyment of any privilege or advantage enjoyed by others; and/or treated the student differently from others in determining whether the student satisfied any requirement or condition which individuals must meet in order to be provided any service or other benefit under the program, in violation of the Title VI implementing regulation at 34 C.F.R. § 100.3(b )(l)(i), (ii), (iv), and/or (v);

b. whether the District failed to keep timely, complete, and accurate records so that the Department of Education may be able to ascertain whether the District has complied or is complying with Title VI, in violation of the Title VI implementing regulation at 34 C.F.R. § 100.6(b); and

c. whether the District failed to provide qualified student with disabilities with a free appropriate public education (FAPE), in violation of the Section504 implementing regulation at 34 C.F.R. § 104.33.[3]

61. Upon information and belief, HPS was notified of the OCR investigation on or before that same date.

### *Retaliation*

62. On July 13, 2022, just one day after OCR had notified Plaintiff that it was initiating an investigation into her complaint, she finally received a letter from HPS's Executive

---

[3] *Id*. at 2.

Director of Curriculum and Staff Development, Defendant Jessica Cotter, denying her reasonable accommodation request at her personal email address.[4]

63. Cotter's letter wrongly asserted that the list of accommodations requested were "outside of the scope of [Plaintiff's] employment."

64. Cotter's letter wrongly asserted that "what you demand as 'reasonable accommodations' is [sic] in fact the legal responsibility of the District's Board of Education and administration."

65. In fact, accommodations such as a solid core door with a lock and a support person in meetings with her principal would have directly alleviated Plaintiff's PTSD symptoms and would have caused no undue hardship to HPS.

66. Whether anything on Plaintiff's list of requested accommodations was a "legal responsibility of [HPS's] Board of Education and administration" has no bearing on whether such could be considered, provided, or would cause undue hardship to HPS as an accommodation.

67. Cotter's letter inappropriately discredited Plaintiff's medical provider's opinion.

68. Cotter's letter stated that Plaintiff was required to have the questionnaire completed again by a different provider.

69. Cotter's letter unlawfully asserted that "[t]he District will not engage with [Plaintiff] further regarding this list."

70. On or around August 1, 2022, Plaintiff requested a copy to HPS's EOP to determine if the plan was sufficient to accommodate her disability.

71. On or around August 4, 2022, Quinlan denied Plaintiff's request.

---

[4] *See* Exhibit 4.

72. Due to HPS's improper denial of her reasonable accommodation request and its refusal to work with her medical provider, Plaintiff requested another leave of absence due to her disability to continue trying to work through the issues in getting accommodations in place.

73. On or around February 27, 2023, Plaintiff was finally able to return to work with a new position as a Math Interventionist/Consultant, a position which provided most of the accommodations she needed and allowed her to perform the essential functions of her position.

74. Upon her return, Plaintiff discovered that approximately 13 to 15 of her unit binders, containing over 20 years of teaching materials related to worksheets, activities, assessments, and lesson plans, were missing.

75. On or around March 13, 2023, Plaintiff met with Cotter and HJHS Principal Dominic Knighten to address the issue of her missing materials.

76. At that meeting, Cotter told Plaintiff the materials were likely thrown away.

### *Attempts to Resolve Concerns Directly with HPS*

77. Plaintiff does not want to file litigation against HPS.  She has taught in the district for 23 years and loves her students and colleagues.

78. Plaintiff attempted to resolve her concerns with HPS without filing litigation.

79. On February 7, 2024, through counsel, Plaintiff sent a demand letter to HPS.

80. On February 19, 2024, counsel for Plaintiff and counsel for HPS engaged in confidential settlement discussions via phone.

81. On March 22, 2024, counsel for Plaintiff sent HPS's counsel and his assistant a specific list of demands as follow up to the February 19 conversation.

82. Counsel for HPS did not respond.

83. On March 29, 2024, counsel for Plaintiff sent HPS's counsel and his assistant an email following up regarding the March 22 email.

84. Counsel for HPS did not respond.

85. On April 8, 2024, counsel for Plaintiff sent HPS's counsel and his assistant another follow-up email.

86. Counsel for HPS's assistant responded that counsel for HPS "was out of the country and is catching a plane today to FL" and asked counsel for Plaintiff to call counsel for HPS on his cell phone.

87. Counsel for Plaintiff called counsel for HPS's cell phone and left a voicemail.

88. Counsel for HPS did not respond to the voicemail.

89. That evening, counsel for Plaintiff sent one final message to counsel for HPS and his assistant notifying them that counsel for Plaintiff was going to have to file this Complaint if counsel for HPS did not respond by 12:00 p.m. on April 9, 2024.

90. Counsel for HPS did not respond.

91. The necessity of filing litigation against HPS has caused Plaintiff additional emotional distress and negative health consequences.

### *Timeliness of Complaint*

92. Plaintiff has exhausted her administrative remedies.  On or around September 16, 2022, she timely filed a complaint alleging discrimination based on disability with the U.S. Equal Employment Opportunity Commission.  On January 10, 2024, she received a Notice of Right to Sue from the U.S. Department of Justice Disability Rights Section.

93. Plaintiff timely filed this action within 90 days of receipt of her Notice of Right to Sue.

**COUNT I**
**Violation of Title I of the ADA**
**Failure to Accommodate**
**42 U.S.C. § 12111 *et seq.***
**(The HPS Defendants)**

94. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

95. Plaintiff is a qualified individual with a disability within the meaning of the ADA because she actually and currently has, has a record of, or is regarded as having a physical or mental impairment that substantially limits one or more major life activities.

96. HPS is a covered entity and an employer under the ADA.

97. Defendants knew of Plaintiff's disability.

98. Plaintiff requested reasonable accommodations for her disability.

99. Defendants failed to engage in the reasonable accommodation process.

100. If Defendants were asserting that Plaintiff's requested reasonable accommodations would cause them undue hardship—which they did not explicitly assert—they failed to complete an individualized assessment of current circumstances that showed that a specific reasonable accommodation would cause significant difficulty or expense and instead unlawfully relied upon generalized conclusions.[5]

101. Defendants refused to accommodate Plaintiff's disability.

102. Plaintiff can perform the essential functions of the job with or without reasonable accommodation.

---

[5] *See* U.S. Equal Employment Opportunity Commission, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA n. 113 (2008), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada.

**COUNT II**
**Violation of Title I of the ADA**
**Disability Discrimination**
**42 U.S.C. § 12101, *et seq.***
**(The HPS Defendants)**

103. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

104. Plaintiff suffered an adverse employment action in being forced to take extended leave due to HPS's failure to accommodate her disability.

105. Defendants treated Plaintiff less favorably than non-disabled employees.

**COUNT III**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**Disability Discrimination**
**29 U.S.C. § 794, *et seq.***
**(The HPS Defendants)**

106. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

107. Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 20 U.S.C. § 794(a); see also 34 C.F.R. § 104.4(a).

108. A person is an "individual with a disability" under Section 504 if that person experiences "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by reference).

16

109. "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

110. A "program or activity" includes public K-12 school districts, a "department, agency, special purpose district, or other instrumentality of a State or of a local government," and "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b) (referencing 20 U.S.C. § 7801(30)).

111. HPS is a "program or activity" under Section 504 and a recipient of federal financial assistance for the provision of elementary and secondary education and is therefore obligated to comply with Section 504 and the regulations under 34 C.F.R. Part 104.

112. Defendants discriminated against Plaintiff by forcing her to take extended leave due to failure to accommodate her disability and by treating her less favorably than non-disabled employees.

**<u>COUNT IV</u>**
**Disability Discrimination**
**Persons with Disabilities Civil Rights Act**
**M.C.L. 37.1101 *et seq*.**
**(The HPS Defendants)**

113. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

114. Defendants are employers within the meaning of PDCRA.

115. Plaintiff is an employee within the meaning of PDCRA.

116. PDCRA prohibits an employer from discriminating against an employee on the basis of disability.

117. Plaintiff is a person with a disability, and/or was regarded as having a disability by Defendants, and thus is covered by PDCRA.

118. Plaintiff's condition substantially interferes with one or more major life activities.

119. Plaintiff's condition does not prevent her from performing the duties of her job.

120. Defendants discriminated against Plaintiff by forcing her to take extended leave due to failure to accommodate her disability and by treating her less favorably than non-disabled employees.

**COUNT V**
**Retaliation**
**Elliott-Larsen Civil Rights Act**
**M.C.L. 37.2101 *et seq*.**
**(The HPS Defendants and Defendant Cotter)**

121. Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

122. Defendants are employers within the meaning of ELCRA.

123. Plaintiff is an employee within the meaning of ELCRA.

124. ELCRA prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing." M.C.L. 37.2701(a).

125. Plaintiff engaged in an ELCRA-protected act when she filed an OCR complaint alleging discrimination against students on the basis of race, color, and disability.

126. Defendants retaliated against Plaintiff by denying her request for a reasonable accommodation the day after they became aware of her complaint, refusing to reasonably

engage in the interactive process with her, and asserting that they would not engage with

her further regarding her list of requested reasonable accommodations.

## **DAMAGES**

127. Plaintiff realleges and incorporates by reference the allegations contained in the previous

paragraphs.

128. As a direct and proximate result of the above-described conduct, Plaintiff suffered general,

special, incidental, and consequential injuries and damages, past, present, and future, in

excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at

the time of trial. These past, present, and future damages include, but are not limited to, the

following:

    a.  Physical injury and suffering;

    b.  Pain, suffering, mental, and emotional distress;

    c.  Physical manifestations of emotional distress including embarrassment, loss of self-

        esteem, disgrace, and humiliations;

    d.  Loss of employment opportunities;

    e.  Damage to her professional reputation;

    f.  Post-traumatic stress disorder;

    g.  Anxiety;

    h.  Depression;

    i.  Sleep disturbances and nightmares;

    j.  Hypervigilance;

    k.  Loss of irreplaceable professional materials;

    l.  Economic loss;

m.  Loss of the ordinary pleasures of everyday life;

n.  Loss of relationships;

o.  Travel and travel-related expenses;

p.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

### RELIEF REQUESTED FOR ALL CAUSES OF ACTION

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A.  For past, present, and future non-economic damages in an amount to be determined at trial;

B.  For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C.  For any appropriate statutory damages;

D.  For costs of this suit;

E.  For punitive damages, according to proof, as appropriate to the individual cause of action;

F.  For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G.  For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H.  All such additional and/or further relief as this Court deems just and equitable under the circumstances.

Respectfully submitted,

Date:   April 8, 2024

***s/Elizabeth K. Abdnour***
Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER, LLP
Attorney for Plaintiff
500 E. Michigan Ave. Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| NICOLE MCGAUGH,<br><br>          Plaintiff,<br><br>  v.<br><br>HOLT PUBLIC SCHOOLS; HOLT PUBLIC SCHOOLS BOARD OF EDUCATION; and JESSICA COTTER, in her official and individual capacities;<br><br>          Defendants. | Case No.: 1:24-cv-368<br><br>Hon. |

Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER LLP
Attorney for Plaintiff
500 E. Michigan Ave. Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com

**DEMAND FOR JURY TRIAL**

NOW COMES Plaintiff NICOLE MCGAUGH, by and through her undersigned counsel, and hereby demands a trial by jury of all the issues in this case.

Respectfully submitted,

Date:   April 8, 2024

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
ABDNOUR WEIKER, LLP
Attorney for Plaintiff
500 E. Michigan Ave. Ste. 130
Lansing, MI 48912
(517) 994-1776
liz@education-rights.com